UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DANIELLE CROSS o/b/o K.S.C., | CASE NO. 5:20-CV-02787-SL |
| Plaintiff, | JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Danielle Cross, mother of K.S.C., a minor child, filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying supplemental security income ("SSI"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On December 17, 2020, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** this matter for additional proceedings.

1

## PROCEDURAL BACKGROUND

Ms. Cross filed for SSI on K.S.C.'s behalf on April 9, 2018, alleging a disability onset date of July 21, 2017, K.S.C.'s birth date. (Tr. 95). The claim was denied initially and on reconsideration. (Tr. 95-112, 113-26). She then requested a hearing before an Administrative Law Judge. (Tr. 137-39). Ms. Cross testified at a hearing before the ALJ on February 19, 2020. (Tr. 45-89).

On April 23, 2020, the ALJ issued a written decision finding K.S.C. not disabled. (Tr. 26-44). The Appeals Council denied Ms. Cross's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 4; *see* 20 C.F.R. §§ 416.1455 & 416.1481). Ms. Cross timely filed this action on December 17, 2020. (ECF #1).

## FACTUAL BACKGROUND

### I.   ADMINISTRATIVE HEARING

The following summarizes Ms. Cross's testimony, presented during the hearing before the ALJ.

Ms. Cross attended the hearing without a representative. (Tr. 49). The ALJ reviewed Ms. Cross's right to representation during the hearing and explained the benefits of having a representative, including that the representative can make sure the record before the ALJ is up to date and includes records helpful to the ALJ's review, help guide the claimant through the legal and procedural aspects of the case, and present the evidence in the best way possible to obtain benefits. (Tr. 49-52). Ms. Cross declined representation during the hearing. (Tr. 52, 56).

2

The ALJ listed the medical records available to him and confirmed with Ms. Cross that the records were up to date. (Tr. 58). After some discussion, the ALJ determined he would need some updated medical records. (Tr. 61-62).

At the time of the hearing, K.S.C. was two and a half years old. (Tr. 68). K.S.C. is the youngest of six children. (*Id.*). K.S.C. is not yet in preschool but receives services through Help Me Grow. (Tr. 69). Ms. Cross works part-time at Akron Children's Hospital. (Tr. 70). When she is at work, Ms. Cross's mother cares for K.S.C. (*Id.*).

Ms. Cross testified about K.S.C.'s silent seizures, a condition K.S.C. developed as a younger infant. (Tr. 70-71). K.S.C. will freeze up, stiffen her whole body, and stare incoherently. (Tr. 71). These events occur once a day and last between thirty seconds and a minute. (*Id.*). When the event is over, K.S.C. looks "worn out." (*Id.*).

K.S.C. has poor vision and esotropia. (Tr. 72). Six months before the hearing, K.S.C. had plastic surgery to fix cartilage issues and position her ears to support glasses. (Tr. 74). K.S.C. does not like wearing glasses but sees better when she does. (Tr. 73). She is very clumsy, but Ms. Cross notices that when K.S.C. wears her glasses, she can walk without bumping into things. (Tr. 72, 74). K.S.C. will only wear the glasses for one or two hours a day and does not let anyone touch her ears. (Tr. 74, 75).

Ms. Cross testified that K.S.C. does not eat solid foods and only drinks from a bottle. (Tr. 76). K.S.C. is allergic to gluten and certain amino acids so she drinks EleCare Junior formula. (*Id.*). K.S.C. enjoys pureed fruit, especially bananas. (Tr. 76-77). K.S.C. also has reflux issues. (Tr. 78). When Ms. Cross attempts to feed K.S.C. solid food she freezes up, acts like she is choking, and lets

3

the food "foam out of her." (Tr. 78). Even with pureed foods, K.S.C requires spoon-feeding from a highchair and tries to throw or knocks it off the table. (*Id.*).

Ms. Cross testified that K.S.C. is not meeting her developmental milestones. (*Id.*). K.S.C. did not walk until she was one and a half years old. (*Id.*). K.S.C. cannot run, jump, or climb. (Tr. 79). Ms. Cross testified that K.S.C. does not show signs of emotion, even when she is sick. (Tr. 81). She explained that K.S.C. does not wave, say hi or bye, or kiss and hug others. (Tr. 79). Though K.S.C. loves her siblings, she does not interact with other children. (Tr. 81). K.S.C. is involved in physical, occupational, and speech therapy. (Tr. 84). K.S.C. uses about ten words total, including "ma," "ba," "da," "up," and "down." (Tr. 79).

Ms. Cross testified that K.S.C. has her own room but will not sleep there. (Tr. 82). Instead, K.S.C. insists on sleeping on the trundle bed in her brother's room. (Tr. 82). That particular brother has autism and is K.S.C.'s favorite brother. (*Id.*). Usually, Ms. Cross sleeps on the floor in the same room. (Tr. 83). K.S.C. wakes up every two hours and needs constant patting and reassurance before sleeping. (Tr. 79). Ms. Cross testified she believes K.S.C. has anxiety and needs such reassurances because she has required tending to her whole life. (*Id.*).

## II.   PERSONAL AND VOCATIONAL EVIDENCE

K.S.C. was about two and a half years old at the time of the administrative hearing. (Tr. 68).

## III.   RELEVANT MEDICAL EVIDENCE

Ms. Cross carried K.S.C. to thirty-seven weeks, who was delivered on July 21, 2017 via emergency cesarean section due to breeched positioning. (Tr. 255). K.S.C. showed signs of respiratory distress within the first five minutes of life. (*Id.*). K.S.C. was admitted to the Neonatal

4

Intensive Care Unit for observation and treatment for respiratory distress. (Tr. 254). The issue resolved by the sixth day of K.S.C.'s life.

At K.S.C.'s newborn well-check appointment on July 27 with Carrie Bohenick, M.D., Ms. Cross reported that K.S.C. was meeting certain developmental milestones, including responding to sounds, fixating on faces, tracking with her eyes, responding to face and voice, lifting her head when prone, having periods of wakefulness, having flexed posture, and moving all extremities. (Tr. 315). Physical examination was normal, except K.S.C.'s anterior fontanelle was flat. (*Id.*). At another well-check on August 1, 2017, Ms. Cross reported occasional spitting up after eating, flatus, and grunting. (Tr. 316).

On September 22, 2017, Dr. Bohenick examined K.S.C. and noted a flat anterior fontanelle, flattening of the right occiput, and a slight protuberance of right ear. (Tr. 322). Ms. Cross reported K.S.C. could coo, was attentive to voices, showed interest in visual and auditory stimuli, smiled responsively, showed pleasure in interactions with caregivers, and could lift her head, neck, and chest when prone. (Tr. 321). Dr. Bohenick diagnosed two-month-old K.S.C. with gastroesophageal reflux disease (GERD) and congenital plagiocephaly. (Tr. 320). Dr. Bohenick prescribed Zantac and referred K.S.C. for a cranial evaluation. (*Id.*). The cranial evaluation showed positional plagiocephaly, and the doctor recommended positioning to treat the problem. (Tr. 404).

At K.S.C.'s four-month well-check on December 1, 2017, Ms. Cross reported K.S.C. is able to babble and coo, smile and laugh, demonstrate a range of feelings, raise her chest when prone, control her head, grasp objects, reach for objects, and respond to affection. (Tr. 325). At the time, K.S.C. was just beginning to roll. (*Id.*). Physical examination revealed a flat anterior fontanelle, flattening of the back of the head, and an ear pit. (Tr. 326). At seven months old, K.S.C. was

diagnosed with strabismus. (Tr. 328). Physical examination showed a flat anterior fontanelle and ear pits. (Tr. 329).

For GERD, K.S.C. treated with Pediatric Gastroenterology. (*See* Tr. 382). After switching formula to address K.S.C.'s intolerance of cow's milk and breastfeeding, she was switched to EleCare formula. (Tr. 399). At ten months, K.S.C. had difficulty advancing to solid foods. (Tr. 386). She gagged or choked and appeared to panic. (*Id.*). At twelve months, K.S.C. showed improved weight gain and was starting to advance on solid foods, including mashed potatoes, rice, and yogurt. (Tr. 382).

On March 21, 2018, and after referral from Dr. Bohenick to Ohio's Help Me Grow Early Intervention, K.S.C. was evaluated. (Tr. 344). The evaluation team determined K.S.C. was exhibiting all skills expected of a child her age in developing positive relationships and acquiring and using knowledge. (Tr. 437). However, the team had concerns because K.S.C. could sit independently but was not yet moving in and out of sitting or getting on her hands and knees. (Tr. 438). The Battelle Developmental Inventory II scores showed no delay in K.S.C.'s developmental abilities.[1] (Tr. 494).

On May 4, 2018, K.S.C. was diagnosed with accommodative esotropia and intermittent alternating esotropia. (Tr. 378).

On May 18, 2018, Dr. Bohenick expressed concern due to multiple small abnormalities, including ear protrusion, esotropia, decreased muscle tone, and developmental delays. (Tr. 333). Ms. Cross reported that K.S.C. was weak on the right side and showed delayed motor skills. (*Id.*).

---

[1] The Battelle Developmental Inventory is a standardized developmental assessment tool that measures a child's performance based on the performance of same-aged peers. *Riverside Insights*, Battelle Developmental Inventory, Second Edition (BDI-2) Normative Update, https://riversideinsights.com/battelle_2e (last visited January 13, 2021).

Ms. Cross also reported that K.S.C. was able to respond to her name, say "mama" and "dada" nonspecifically, creep, crawl or scoot, point, shake and throw objects, seek parent interaction, and explore her environment. (Tr. 334). K.S.C. was not able to understand "no," babble and imitate vocalizations, sit independently, pull herself to a standing position, play peek-a-boo, wave bye-bye, feed herself with her fingers, drink from a cup, or seek hidden objects. (*Id.*). Physical examination revealed ear pits, protruding ears, an in-turning of K.S.C.'s left eye, and slightly decreased muscle tone on the right side. (Tr. 335).

Ms. Cross met with Ananth Murthy, M.D., on May 24, 2018 at the Plastic Surgery Center to discuss surgical options for K.S.C.'s ears. (Tr. 335-36). K.S.C. requires glasses because she is far-sighted, but K.S.C.'s protuberant and floppy ears made it impossible for her to wear glasses. (Tr. 335). In June 2018, K.S.C. underwent surgery for ear tube placement bilaterally. (Tr. 354). On September 27, 2019, K.S.C. underwent a bilateral otoplasty to fix her protuberant and floppy ears. (Tr. 579).

On August 10, 2018, Ms. Cross reported concerns to Dr. Bohenick about possible seizures. (Tr. 414). Ms. Cross also informed Dr. Bohenick that a physical therapist, an occupational therapist, and a speech therapist from Help Me Grow would see K.S.C. on September 24, 2018. (*Id.*). Ms. Cross reported that K.S.C. could play peek-a-boo, wave bye-bye, say mama and dada, imitate vocalizations and activities, and use a precise pincer grasp. (Tr. 415). She reported K.S.C. could not use one to three words, walk, or point with her index finger. (*Id.*). Dr. Bohenick referred K.S.C. to a neurologist to evaluate the possible seizure activity. (Tr. 414). After an EEG and consultation with a certified nurse practitioner, K.S.C. was diagnosed with Sandifer syndrome, a rare pediatric manifestation of GERD characterized by abnormal and dystonic movements of the

head, neck, eyes, and trunk.[2] (Tr. 420). The neurologist recommended thickening K.S.C.'s formula and reflux precautions. (*Id.*).

In November 2018, K.S.C. had her fifteen-month well-check with Dr. Bohenick. (Tr. 565). Dr. Bohenick noted that the child was unable to feed herself with her fingers, understand simple commands, use 3-6 words, or walk well. (Tr. 566). Ms. Cross reported K.S.C. indicates her wants by pulling, pointing, and grunting. (*Id.*). K.S.C. was able to pull herself to standing, walk along furniture, and walk with assistance. (Tr. 567). On physical examination, K.S.C. exhibited slightly decreased muscle tone on the right side. (*Id.*).

At K.S.C.'s eighteen-month well-check with Dr. Bohenick, Ms. Cross reported that K.S.C. can listen to a story, play peek-a-boo, wave bye-bye, feed herself with her fingers, drink from a cup, seek parent interaction, follow simple directions, point to some body parts, vocalize and gesture, show affection, and laugh in response to others. (Tr. 569). K.S.C. was unable to scribble, use 6-20 words, go up a set of stairs, walk quickly or run, stack two or three objects, name objects, or point to indicate wants. (*Id.*). On physical examination, K.S.C. exhibited weakness and increased muscle tone on her right side. (Tr. 570).

By March 2019, K.S.C. remained eligible for Early Intervention services due to developmental delays in adaptive behavior, cognitive development, and receptive and expressive communication. (Tr. 482). On the Battelle Developmental Inventory II test, K.S.C. scored lower in all categories. (Tr. 494). As to K.S.C.'s ability to develop positive relationships, she showed many age-expected skills, but showed some functioning more consistent with a younger child. (Tr. 487). In acquiring and using knowledge and skills, K.S.C showed "occasional use of some age expected

---

[2]    *Genetic and Rare Diseases Information Center*, Sandifer Syndrome, https://rare diseases.info.nih.gov/diseases/9684/sandifer-syndrome (last visited January 13, 2021).

skills, but more of her skills are not yet age expected." (Tr. 486). In taking appropriate action to

meet her needs, K.S.C. again showed "occasional use of some age expected skills, but more of her

skills are not yet age expected." (*Id.*).

The evaluator gave assessment summaries of K.S.C.'s daily routines. (Tr. 483-84). K.S.C.

sleeps in her crib and wakes up every three hours or so to be consoled, but will go back to sleep

after some pats and a sip from her bottle. (Tr. 483). K.S.C. screams and "battles" her mom when

being dressed. (*Id.*). K.S.C. is cooperative with diaper changes, but has started to hide when she has

a bowel movement and will stay hidden until her mom finds her. (*Id.*). K.S.C. takes formula from a

bottle and water from a soft nipple cup. (*Id.*). K.S.C. will not use utensils, but feeds herself tiny

pieces of food. (*Id.*). Sometimes, she overstuffs her mouth. (*Id.*). K.S.C. is not around other

children her age but is affectionate with family and friends. (*Id.*). She will separate easily from mom

when she knows the other person with her. (*Id.*). K.S.C. entertains herself with age-appropriate toys

for about five minutes. (Tr. 484). K.S.C. is quiet during play and is easily redirected back to a toy

for extended play when an adult takes the lead. (*Id.*). K.S.C. enjoys bath time and will go to the

bathroom when mom says it is time for a bath. (*Id.*). K.S.C. does not like having her teeth brushed;

mom uses mouth wipes to clean K.S.C.'s teeth. (*Id.*).

At her two-year well-check, Dr. Bohenick noted K.S.C. was making slow progress in her

development. (Tr. 576). Ms. Cross reported K.S.C. still will not eat solid foods and only wants

formula, but  was gaining good weight. (*Id.*). Ms. Cross also reported K.S.C. was babbling more but

using very few words. (*Id.*). K.S.C. was not yet toilet trained. (Tr. 577). Ms. Cross endorsed

difficulty sleeping, noting that K.S.C. wakes up every two hours and screams to be held. (*Id.*). Dr.

Bohenick noted K.S.C. could not use at least 20 words, go up and down stairs one step at a time, use two-word phrases, jump up, follow two-step commands, or point to something in a book. (*Id.*).

On January 17, 2020, Ms. Cross and K.S.C. met with Jacqueline Branch, M.D., who specializes in developmental pediatrics. (Tr. 680). On examination, Dr. Branch noted that K.S.C. was engaging and interactive, made good eye contact, was pointing, and responded to her name. (Tr. 683). K.S.C. used some single words and facial expressions. (*Id.*). Dr. Branch concluded that K.S.C. had global developmental delay. (*Id.*).

## IV.  MEDICAL OPINIONS

State agency medical consultants reviewed K.S.C.'s record at the initial and reconsideration levels. At the initial level, the medical consultant determined that K.S.C. had no limitation or a less-then-marked limitation in all domains, except in acquiring and using information, where he found K.S.C. had a marked limitation. (Tr. 107-08). The consultant supported his conclusion by noting K.S.C.'s standardized scores on the Preschool Language Scale-5. (Tr. 107). On reconsideration, the consultant adopted the same evaluation. (Tr. 123).

On August 22, 2018, K.S.C., then thirteen months old, underwent a consultative examination conducted by James Liang, M.D., F.A.A.P. (Tr. 410-412). Ms. Cross reported her concerns about K.S.C.'s developmental delay, esotropia, ear issues, and difficulty swallowing solid foods. (Tr. 410). She noted K.S.C. did not sit up, turn over, or begin crawling until she was about twelve months old, drinks from a bottle but not a sippy cup, babbles and says few words, and cannot wave bye-bye but can play patty-cake. (*Id.*). Ms. Cross reported K.S.C. received therapy through Help Me Grow. (*Id.*). Ms. Cross also endorsed seizure-like episodes of muscle tightness. (Tr. 411). Dr. Liang found K.S.C. to be alert and interactive during the examination. (*Id.*).

10

Functionally, Dr. Liang determined that K.S.C.'s abilities to roll over, sit up, crawl, and say non-specified "mommy" and "daddy" puts her at three-quarters of her chronological age. (Tr. 412). Dr. Liang did not provide any assessment of K.S.C.'s abilities or limitations.

On October 17, 2018, when K.S.C. was fifteen months old, she attended a speech-language evaluation conducted by speech-language pathologist Janice Hensley, M.A., CCC/SLP. (Tr. 448). Ms. Hensley's evaluation considered direct interaction with K.S.C., observation, and information provided by Ms. Cross. (*Id.*). As part of the evaluation, K.S.C. was tested using the Preschool Language Scales-5. (Tr. 449). The average standard score for the test was 85-115. (*Id.*). K.S.C.'s Total Language Score was 62, placing her in the bottom 1% rank. (*Id.*).

Ms. Hensley noted profound delays in K.S.C.'s receptive and expressive language skills. (*Id.*). As to receptive language, K.S.C. showed strengths in looking for objects removed from sight, banging objects together, smiling at herself in the mirror, clapping, and attending to music. (Tr. 448). She showed weaknesses in responding to "no," looking at objects or people the caregiver names, responding to "come here," attending to pictures, and responding when her name is called. (*Id.*). As to expressive language, K.S.C. showed strengths in smiling at speakers and caregivers, vocalizing two vowels and /m, d/, and vocalizing pleasant sounds. (Tr. 448-449). Weaknesses included imitating facial expressions, waving "bye," laughing, and babbling. (Tr. 449).

Ms. Hensley noted that K.S.C.'s communication difficulties made it so that she cannot express basic needs to family and caregivers. (Tr. 447). Ms. Hensley believed K.S.C.'s prognosis for improved speech and language skills was good with intervention and speech therapy, and estimated the duration of treatment to last over two years. (*Id.*).

11

On November 26, 2018, K.S.C. was re-evaluated by Melinda Siefker, a speech-language pathologist. Ms. Siefker noted K.S.C. demonstrated adequate strength and timing for swallowing liquids, but had severely decreased lingual and labial coordination and was unable to bite into items, indicating decreased mandible strength. (Tr. 467). Ms. Siefker also noted K.S.C. did not open her mouth frequently to vocalize and appeared to have difficulty in motor planning. (Tr. 468). Ms. Cross reported that K.S.C. frequently grunts to get her needs met. (*Id.*). Ms. Siefker observed this frequently during the evaluation. (*Id.*). Ms. Siefker also observed signs of apraxia and sensory processing disorder. (*Id.*). Ms. Siefker characterized K.S.C.'s receptive and expressive language deficits as severe. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision, dated April 28, 2020, included the following findings of fact and conclusions of law:

1. The claimant was born on July 21, 2017. Therefore, she was defined as a newborn/young infant on April 9, 2018, the date the application was filed, and she is currently defined as an older infant/toddler (20 CFR 416.926a(g)(2).

2. The claimant has not engaged in substantial gainful activity since April 9, 2018, the application date (20 CFR 416.924(b) and 416.971 *et seq.* and 416.972).

3. The claimant has the following severe impairments: Sandifer's syndrome with plagiocephaly and speech, language, and developmental delays (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925, and 416.926).

5.    The claimant does not have an impairment or a combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.    The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since April 9, 2018, the date the application was filed (20 CFR 416.924(a)).

(Tr. 30-38).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference.

13

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

14

1.   Is the claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical conditions. If not, the analysis proceeds.

2.   Does claimant have a medically determinable, severe impairment, or a combination of impairments, that is severe? For an individual under age 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.   Does the severe impairment meet, medically equally, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor child's functioning is assessed in six functional domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* at § 416.926a(a).

A marked limitation is one that seriously interferes with the ability to independently initiate, sustain, or complete activities. *Id.* at § 416.926a(e)(2)(i). It is a more than moderate, but less than extreme, limitation. *Id.* It is the equivalent of the functioning one would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* If the child has not reached age 3, the Agency will generally find the child has a marked limitation if the child is functioning at a level that is more than one-half but not more

15

than two-thirds of the child's chronological age when there are no standard scores from standardized tests in the case record. *Id.* at § 416.926a(e)(2)(ii).

An extreme limitation is one very seriously interferes with the ability to independently initiate, sustain, or complete activities. *Id.* at § 416.926a(e)(3)(i). An extreme limitation is more than marked but does not necessarily mean a total lack or loss of ability to function. *Id.* It is the equivalent of functioning one would expect to find on standardized testing with scores that are at least three standard deviations below the mean. *Id.* If the child has not reached age 3, the Agency will generally find the child has an extreme limitation if the child is functioning at a level that is one-half of the child's chronological age or less when there are no standard scores from standardized tests in the case record. *Id.* at § 416.926a(e)(3)(ii). No single piece of information taken in isolation can establish whether a child has a marked or extreme limitation; therefore, test scores are considered together with other available information about the child's functioning.[3] *Id.* at § 416.926a(e)(4).

The Agency directs its adjudicators to assess the interactive and cumulative effects of all a child's impairments and to consider the relevant factors that affect a child's functional limitations, including how well the child initiates and sustains activities, how much extra help the child needs, the effects of structured or supportive settings, and medication or other treatment affects the child. *Id.* at § 416.926a(a)(1)-(3).

---

[3]     The evidence may include testing that provides information about a child's development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (*e.g.*, percentiles) can be converted to standard deviations. 20 C.F.R. § 416.926(e)(1)(ii).

DISCUSSION

Ms. Cross assigns two errors to the ALJ's written decision and moves for a Sentence Six remand pursuant to 42 U.S.C. § 405(g).

## I.     Evaluation of State Agency Medical Consultants' Opinions

Ms. Cross, on behalf of K.S.C., claims the ALJ erred in evaluating the state agency medical consultants' opinions solely in relation to their conclusion that K.S.C. had a marked limitation in acquiring and using information. (Pl.'s Br., ECF #13, PageID 827). She argues the ALJ minimized the evidence regarding K.S.C.'s speech limitations, and her difficulty forming concepts and solving simple problems. (*Id.* at PageID 828). Ms. Cross claims the medical consultants' opinions that K.S.C. had a marked limitation in acquiring and using information are well-supported by the medical records, including the Preschool Language Scales-5 showing K.S.C. was well below the average score range and placed her in the bottom 1% compared to other children. (*Id.*). Ms. Cross claims the ALJ focused on minimal strengths, including walking, playing with toys and markers, and interacting with her family, but ignored substantial evidence that K.S.C. does not fulfill the statutory criteria for a less than marked degree of limitation. (*Id.* at PageID 829).

In response, the Commissioner claims the ALJ properly determined K.S.C. did not have a marked limitation in acquiring and using information. (Comm'r's Br., ECF #16, PageID 899). The Commissioner noted the ALJ "drew upon clinical observations illustrating that [K.S.C.] was able to engage in a wide variety of age-appropriate activities despite her significant developmental delays." (*Id.*). The Commissioner also noted the ALJ considered the medical consultants' findings in this functional domain, but discounted it because "it was unsupported by [K.S.C.'s] documented

17

capacity to acquire and learn new skills and inconsistent with Dr. Liang's opinion that [K.S.C.] was functioning at three-fourths of her chronological age." (*Id.*).

Before analyzing the ALJ's evaluation of the medical consultants' opinions, I pause to summarize the Agency's regulations pertaining to acquiring and using information. This domain considers how well a child acquires or learns information and how well they use that information. 20 C.F.R. § 416.926a(g). The regulations offer a general summary of the domain:

> (i) Learning and thinking begin at birth. You learn as you explore the world through sight, sound, taste, touch, and smell. As you play, you acquire concepts and learn that people, things, and activities have names. This lets you understand symbols, which prepares you to use language for learning. Using the concepts and symbols you have acquired through play and learning experiences, you should be able to learn to read, write, do arithmetic, and understand and use new information.
>
> (ii) Thinking is the application or use of information you have learned. It involves being able to perceive relationships, reason, and make logical choices. People think in different ways. When you think in pictures, you may solve a problem by watching and imitating what another person does. When you think in words, you may solve a problem by using language to talk your way through it. You must also be able to use language to think about the world and to understand others and express yourself; *e.g.,* to follow directions, ask for information, or explain something.

*Id.* at § 416.926a(g)(1). The regulations also provide helpful age group descriptors:

> (i) Newborns and young infants (birth to attainment of age 1). At this age, you should show interest in, and explore, your environment. At first, your actions are random; for example, when you accidentally touch the mobile over your crib. Eventually, your actions should become deliberate and purposeful, as when you shake noisemaking toys like a bell or a rattle. You should begin to recognize, and then anticipate, routine situations and events, as when you grin with expectation at the sight of your stroller. You should also recognize and gradually attach meaning to everyday sounds, as when you hear the telephone or your name. Eventually, you should recognize and respond to familiar words, including family names and what your favorite toys and activities are called.
>
> (ii) Older infants and toddlers (age 1 to attainment of age 3). At this age, you are learning about the world around you. When you play, you should learn how

18

objects go together in different ways. You should learn that by pretending, your actions can represent real things. This helps you understand that words represent things, and that words are simply symbols or names for toys, people, places, and activities. You should refer to yourself and things around you by pointing and eventually by naming. You should form concepts and solve simple problems through purposeful experimentation (*e.g.,* taking toys apart), imitation, constructive play (*e.g.,* building with blocks), and pretend play activities. You should begin to respond to increasingly complex instructions and questions, and to produce an increasing number of words and grammatically correct simple sentences and questions.

*Id.* at § 416.926a(g)(2).

The ALJ evaluated the medical opinions as follows:

Consultative examiner Dr. Liang concluded that the claimant is functioning at approximately ¾ of her chronological age, which appears consistent with the claimant's early intervention assessments that find her with "some" age-appropriate skills and some deficits in age-appropriate functioning, and while Ms. Hensley termed the claimant's speech/language deficits "profound," neither Dr. Branch nor the evaluating early intervention specialists documented findings or opinions reflective of such magnitude of dysfunction.

The State agency medical consultants concluded the claimant has a marked limitation in acquiring and using information because the claimant has had marked difficulties in learning speech/language. While the undersigned agrees that the claimant's primary area of difficulty appears to be her lack of appropriate speech, the claimant has demonstrated a capacity for learning, such as learning to walk, to use markers, to play with toys, to blow kisses to her brother, and to recognize family and friends. Consequently, the undersigned does not find the claimant's overall functioning in this domain markedly limited, noting that even if the claimant's limitations in this area were found to rise to a marked level, the record does not establish marked or extreme limitations in any other domain.

(Tr. 37-38).

Because Ms. Cross filed K.S.C.'s application after March 27, 2017, the case is evaluated under the regulations found in 20 C.F.R. §§ 404.1520c and 416.920c, which require the ALJ to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. §§ 404.1520c(b), 416.920c(b).

19

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *Id.* at §§ 404.1520c(a), 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[4] and consistency.[5] *Id.* at §§ 404.1520c(b), 416.920c(b). The ALJ is required only to say enough to allow this Court to trace the path of the reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011).

Here, the ALJ did articulate how he considered the supportability and consistency of the consultants' opinions, noting that the consultants' opinion as to the degree of limitation was inconsistent with K.S.C.'s demonstrated capacity for learning, such as learning to walk, to use markers, to play with toys, to blow kisses to her brother, and to recognize family and friends. (Tr. 38). However, pursuant to the Agency's regulations, the abilities to walk, to use markers, and to use gestures to interact with others are not relevant to the domain of acquiring and using information, but relevant to other domains. For example, walking and using markers and crayons to scribble are activities relevant to the domain of moving about and manipulating objects. *See* 20 C.F.R. § 416.926a(j). The ability to use gestures to interact with others, such as by blowing kisses to a sibling, is an activity relevant to the domain of interacting and relating with others. *See* 20

---

[4]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

C.F.R. § 416.926a(i). And, the ability to recognize family and friends, while relevant to the domain of acquiring and using information, is age-appropriate for newborns and young infants – but is not relevant to K.S.C.'s current degree of limitations at age 2 ½. *See* 20 C.F.R. § 416.926a(g)(2)(i). The ALJ did not offer additional articulation about how he evaluated the State agency medical consultants' opinion, or additional explanations for finding the opinion unpersuasive.

It bears repeating that the District Court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Because the ALJ's reasons for finding the opinion not persuasive are not relevant to acquiring and using information, the ALJ has not built an accurate and logical bridge between the evidence and his conclusion.

I also note the ALJ mentioned that K.S.C.'s evaluators conducted standardized testing to measure development (Battelle Developmental Inventory II and the Preschool Language Scale-5) and noted one of the scores in his decision, but did not use the information appropriately to analyze K.S.C.'s limitations, as the regulations direct. *See* 20 C.F.R. § 416.926a(e)(1)(ii) ("The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (*e.g.* percentiles) can be converted to standard deviations. When you have such scores, *we will consider them together with the information we have about your functioning* to determine whether you have a "marked" or "extreme" limitation in a domain.") (emphasis added). The ALJ noted K.S.C.'s Total Language score of 62 but did mention that the score placed K.S.C. in the 1% rank compared

21

to her same-aged peers. (Tr. 36). The ALJ noted that K.S.C. took the Battelle Developmental Inventory II twice and that her more recent scores decreased. (Tr. 36). Though the record contains both sets of scores, the ALJ did not mention or analyze them as required under the regulations.

The Commissioner argues that remand is a useless and idle formality because even if the ALJ found the medical consultants' opinion that K.S.C. had a marked limitation in acquiring and using information, K.S.C. would still not meet the standard for disability. (Comm'r's Br., ECF #16, PageID 903). However, Ms. Cross has also alleged the ALJ erred in concluding K.S.C. did not have at least a marked limitation in the domain of caring for herself. Therefore, I proceed with my analysis of Ms. Cross's next error before considering whether remand would be fruitless.

## II.  Evaluation of K.S.C.'s Abilities in the Caring For Yourself Domain

The domain of "caring for yourself" encompasses how well a child maintains a healthy emotional and physical state, including how well the child gets their physical and emotional wants and needs met in appropriate ways; how well the child copes with stress and changes in environment; and whether the child takes care of their own health, possessions, and living area. 20 C.F.R. § 416.926a(k). The regulations offer a useful summary about the domain:

> (i) Caring for yourself effectively, which includes regulating yourself, depends upon your ability to respond to changes in your emotions and the daily demands of your environment to help yourself and cooperate with others in taking care of your personal needs, health and safety. It is characterized by a sense of independence and competence. The effort to become independent and competent should be observable throughout your childhood.

> (ii) Caring for yourself effectively means becoming increasingly independent in making and following your own decisions. This entails relying on your own abilities and skills, and displaying consistent judgment about the consequences of caring for yourself. As you mature, using and testing your own judgment helps you develop confidence in your independence and competence. Caring for yourself includes using your independence and competence to meet your physical needs, such as feeding, dressing, toileting, and bathing, appropriately for your age.

22

(iii) Caring for yourself effectively requires you to have a basic understanding of your body, including its normal functioning, and of your physical and emotional needs. To meet these needs successfully, you must employ effective coping strategies, appropriate to your age, to identify and regulate your feelings, thoughts, urges, and intentions. Such strategies are based on taking responsibility for getting your needs met in an appropriate and satisfactory manner.

(iv) Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others.

*Id.* at § 416.926a(k)(1). The regulations also provide helpful age group descriptors:

(i) Newborns and infants (birth to attainment of age 1). Your sense of independence and competence begins in being able to recognize your body's signals (e.g., hunger, pain, discomfort), to alert your caregiver to your needs (e.g., by crying), and to console yourself (e.g., by sucking on your hand) until help comes. As you mature, your capacity for self-consolation should expand to include rhythmic behaviors (e.g., rocking). Your need for a sense of competence also emerges in things you try to do for yourself, perhaps before you are ready to do them, as when insisting on putting food in your mouth and refusing your caregiver's help.

(ii) Older infants and toddlers (age 1 to attainment of age 3). As you grow, you should be trying to do more things for yourself that increase your sense of independence and competence in your environment. You might console yourself by carrying a favorite blanket with you everywhere. You should be learning to cooperate with your caregivers when they take care of your physical needs, but you should also want to show what you can do; e.g., pointing to the bathroom, pulling off your coat. You should be experimenting with your independence by showing some degree of contrariness (e.g., "No! No!") and identity (e.g., hoarding your toys).

*Id.* at § 416.926a(k)(2).

Ms. Cross claims the ALJ erred in finding that K.S.C. displayed generally age appropriate and expected abilities in the domain of caring for yourself. (Pl.'s Br., ECF #13, PageID 830). She argues the evidence and hearing testimony show that K.S.C. does not generally display age appropriate and expected abilities in this domain and cites to numerous records to support her argument. (*Id.* at PageID 830-31). The Commissioner responds that the ALJ's conclusion is

23

supported by substantial evidence and notes that this Court is precluded from reweighing the evidence and setting aside the ALJ's reasonable interpretation in favor of Ms. Cross's preferred result. (Comm'r's Br., ECF #16, PageID 907).

In determining whether the ALJ's findings are supported by substantial evidence, courts must examine the evidence in the record taken as a whole and take into account whatever in the record fairly detracts from its weight. *See Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

The ALJ explicitly noted K.S.C. has an "oral aversion" to solid foods, but she does not require tube feeding and is growing and gaining weight; when K.S.C. was an infant, she would cry when hungry; and could grunt and point toward what she wants. (Tr. 34, 36, 37). These are the findings the ALJ uses to support his conclusion that K.S.C. has a less-than-marked limitation in the domain of caring for yourself.

In the limited discussion of the self-care domain in the decision below, the ALJ did not address record evidence of difficulty with emotional self-regulation and self-soothing, cooperating with caregivers to take care of physical needs, and independence. For instance, K.S.C. requires glasses, but does not like wearing them despite seeing better and being less clumsy when wearing them. (Tr. 72-75). She will only wear the glasses one or two hours a day and will not let anyone touch her ears. (*Id.*). K.S.C. can drink from a bottle on her own; however, she still avoids most solid foods, but takes purees, which requires spoon-feeding from a highchair. (Tr. 76, 78). K.S.C. can feed herself tiny pieces of food, but will not use utensils. (Tr. 483). Ms. Cross must watch K.S.C. closely because she overstuffs her mouth rather than swallowing individual pieces of food. (*Id.*). K.S.C. will not sleep in her own room. (Tr. 82). She insists on sleeping on a trundle bed in

24

her favorite brother's room. (*Id.*). Ms. Cross most often sleeps on the floor next to K.S.C. because K.S.C. wakes up every two or three hours, screaming and crying. (Tr. 79, 483). She requires constant patting and reassurances before sleeping. (Tr. 79). K.S.C. screams and "battles" her mom when being dressed. (Tr. 483). While K.S.C. is cooperative with diaper changes, she hides when she has a bowel movement and will stay hidden until her mom finds her. (*Id.*). K.S.C. does not like to have her teeth brushed, requiring her mom to use mouth wipes to provide oral hygiene. (Tr. 484).

The ALJ does not discuss that evidence as it relates to the caring for yourself domain; indeed, he did not mention much of that evidence at all. While an ALJ is not required to discuss each and every piece of evidence in the record to justify his determination, *see, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004), "the ALJ must give some indication of the evidence upon which he is relying, and may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Johnson v. Comm'r of Soc. Sec.*, No. 1:15-cv-648, 2016 WL 4761577, at *13 (N.D. Ohio September 13, 2016) (quotation omitted).

Despite providing limited explanation for his finding, the ALJ glossed over, or omitted entirely, highly probative evidence that could potentially undermine his conclusion. Having done so, this Court cannot tell if that evidence was not credited or simply ignored, precluding this Court from permitting meaningful review.

Having determined that the ALJ erred with respect to his findings in two of the functional domains, the errors are not harmless, and remand is warranted. Because remand is appropriate

25

based on ALJ error, Ms. Cross's request for remand pursuant to Sentence Six of 42 U.S.C. 405(g) is moot.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security benefits and **REMAND** this matter for further proceedings.

Dated: January 14, 2022

_____

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the

interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).